**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIM. NO. 26-205** |
| **KRANDON WENGER** | : | |

# GOVERNMENT'S SENTENCING MEMORANDUM

The defendant fraudulently overbilled the government for almost $750,000 in taxpayer dollars. He abused and manipulated the Affordable Connectivity Program ("ACP"), which was established by Congress to ensure that individuals suffering from the COVID-19 pandemic could continue to receive broadband Internet services. In just nine months, from July 2022 to May 2023, the defendant, through his company K20 Wireless, submitted thousands of claims falsely stating that his company's subscribers lived on federal tribal lands, when, in fact, they did not. By lying about where the subscribers lived, the defendant received $75 per month per subscriber, as opposed to the permissible $30 per month. In total, he overbilled the ACP by $741,726. He used this stolen money to buy a house and luxury vehicle and to fund his lifestyle. Fortunately, the defendant's fraud was quickly detected by the Federal Communications Commission ("FCC"), which stopped his company from receiving further payments on his false claims and prevented him from stealing more taxpayer dollars. For the reasons discussed below, the government recommends a sentence of incarceration within the 15- to 21-month guideline range, absent any basis for a below-guideline sentence addressed in the supplemental sealed attachment to this sentencing memorandum.

## I. PROCEDURAL HISTORY

On May 12, 2026, the government filed an Information charging the defendant with two counts of wire fraud, in violation of 18 U.S.C. § 1343. On June 2, 2026, the defendant pled guilty to these charges pursuant to a plea agreement.

## II. SENTENCING CALCULATION

### A. Statutory Maximum Sentences

The statutory maximum penalties for each of Counts One and Two, charging wire fraud, are a term of imprisonment of 20 years, a term of supervised release of 3 years, a fine of $250,000 or twice the gross pecuniary gain or loss from the offense, and a special assessment of $100. The total permissible statutory maximum sentence is a term of imprisonment of 40 years, a term of supervised release of 3 years, a fine of $500,000 or twice the gross pecuniary gain or loss from the offenses, and a special assessment of $200. Full restitution of as much as $741,726 shall be ordered.

### B. Sentencing Guidelines Calculation

The government agrees with the Probation Office's calculation of a guidelines range of 15 to 21 months' imprisonment (total offense level 14 and criminal history category I). The calculation is as follows:

- The base offense level offense is 7 (USSG § 2B1.1(a)(1)).
- 12 points are added because of actual loss of $741,726 (USSG § 2B1.1(b)(1)).
- 3 points are subtracted for acceptance of responsibility and timely plea (USSG § 3E1.1).
- 2 points are subtracted due to the defendant having 0 criminal history points (USSG § 4C1.1).

**C. Analysis of 18 U.S.C. § 3553(a) Factors**

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 128 S. Ct. 586, 596 (2007). Thus, the Sentencing Guidelines remain an indispensable resource for assuring appropriate and uniform punishment for federal criminal offenses. This Court must also consider all of the sentencing considerations set forth in Section 3553. Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553. The relevant § 3553 factors will be discussed in turn.

1. <u>The Nature and Circumstances of the Offenses</u>

The defendant's crimes were serious. From July 2022 to May 2023, the defendant overbilled the FCC by approximately $741,726 and used that money to buy a house and Chevrolet Corvette and to fund his lifestyle.

His use of taxpayer money to enrich himself is troubling. But it is all the more troubling when considering that he took advantage of a government program that was intended to provide financial support to low-income households. Specifically, the ACP allowed low-income

households to receive $30 per month in reimbursements for broadband services, so that those households could continue to receive such services during the COVID-19 pandemic. If an eligible household was on Tribal lands—i.e., any federally recognized Indian tribe's reservation, pueblo, or colony, including former reservations in Oklahoma, Alaska Native regions, Indian allotments, and Hawaiian home lands—the monthly reimbursement increased to $75.

After being an approved ACP broadband services provider—and promising to the FCC that his company, K20 Wireless, LLC, would abide by all program rules—the defendant repeatedly lied about where his company's subscribers lived. Although the defendant knew that the subscribers did not live on tribal lands, in his claims to the government, the defendant said the exact opposite. This was not a momentary lapse of judgment. Rather, from July 2022 to May 2023, he submitted over $1.6 million in ACP claims that falsely stated thousands of K20 Wireless's subscribers lived on tribal lands, when they did not. The defendant falsely certified that these claims were true and accurate and compiled with ACP program rules:

| **Approximate ACP Claim Submission Date** | **Approximate Number of K20 Wireless ACP Subscribers Who Were Falsely Represented to be Living on Tribal Lands** | **Approximate Amount of Reimbursement Requests for Such Subscribers** |
|---|---|---|
| July 4, 2022 | 46 | $3,450 |
| August 6, 2022 | 98 | $7,215 |
| September 6, 2022 | 698 | $52,350 |
| October 3, 2022 | 1226 | $91,950 |
| November 10, 2022 | 1931 | $144,465 |
| December 7, 2022 | 2677 | $200,775 |
| January 5, 2023 | 3096 | $232,200 |
| February 8, 2023 | 2494 | $187,050 |
| March 13, 2023 | 4274 | $320,550 |
| April 11, 2023 | 3426 | $256,950 |
| May 11, 2023 | 1729 | $129,675 |
| | Total | $1,626,630 |

The defendant had an organized system for falsifying the tribal addresses: (i) he compiled a list of tribal addresses in approximately 35 states; (ii) using the list, he changed, and caused K20 Wireless employees to change, the non-tribal addresses of ACP subscribers to those specific tribal addresses in the ACP's National Lifeline Accountability Database ("NLAD"); and (iii) certified that these claims, including the fake subscriber addresses, were true and accurate. He did this for one simple reason: to obtain the higher $75 per month reimbursement rate, even though his company or the subscribers were not entitled to that amount. Consistent with his list of tribal addresses, the defendant's false ACP claims showed that many subscribers purportedly lived at the same tribal address (many of which were not even residential addresses):

| **Tribal Address Used by K20 Wireless in NLAD** | **Number of K20 Subscribers Falsely Represented to be Living at the Address** |
|---|---|
| Address on tribal land in Cherokee, NC | 299 |
| Administrative office of tribe located in Choctaw, MS | 219 |
| Administrative office of tribe located in Lakeport, CA | 210 |
| Administrative office of tribe located in Rock Hill, SC | 177 |
| Casino operated by tribe located in Kinder, LA | 175 |
| Hotel operated by tribe located in Salamanca, NY | 167 |
| Administrative office of tribe located in Brimley, MI | 160 |
| Police department of tribe located Atmore, AL | 151 |
| Administrative office of tribe located in Crandon, WI | 106 |
| Administrative office of tribe located in Forks, WA | 100 |

Perhaps due to the rudimentary nature of his scheme, the FCC initiated an investigation and swiftly concluded that K20 Wireless's tribal claims were false. As a result of the investigation, in early April 2023—just eight months after his scheme began—the FCC stopped paying K20 Wireless's claims. K20 Wireless did not receive payments for its ACP claims on

April 11, 2023 or May 11, 2023. The actual fraud loss is $741,726, which represents the overbilling on the $1,236,210 in claims that K20 Wireless was paid.

There is every reason to believe that the defendant would have continued to submit fraudulent claims and overbill the FCC had he not gotten caught. Indeed, the number of false claims grew continually from July 2022 to March 2023. The number of claims submitted in May 2023 was lower, but that was likely due to the fact that on April 18, 2023, the defendant received an email advising him of the FCC's investigation and the suspension of his account due to the "[c]reation of large volumes of applications at the same address location . . . but with different unit numbers." Despite receiving this message, the defendant submitted $129,675 worth of fake tribal claims in May 2023.

The ACP reimbursements were paid into a K20 Wireless bank account controlled by the defendant. The fraud proceeds were used to purchase, among other things, a residence at 701 Woodfield Drive, Lititz, Pennsylvania 17543 and a 2017 Chevrolet Corvette and to fund the defendant's personal expenses, such as restaurants, grocery stores, gas, and household stores.

2. The History and Characteristics of the Defendant

The defendant is 26 years old. He runs his own business, Wenger Enterprises, which currently performs marketing services. (PSR ¶ 67.) He has been self-employed since 2020, and one of the businesses that he operated (K20 Wireless) was used to carry out the fraud scheme. (*Id.* ¶ 67-68.) The defendant does not have any criminal history.

When weighing the defendant's characteristics, the Court should consider that the defendant completely accepted responsibility. After being advised of the investigation through a target letter, the defendant promptly retained defense counsel and later agreed to plead guilty pursuant to an information. As a result, the government never had to present its case to a grand

jury, and the Court did not need to preside over what would have been a complicated trial or rule on any pretrial or posttrial motions. The defendant's early guilty plea allowed the government and Court to allocate their resources efficiently during the pendency of this case.

The defendant also agreed to forfeit property that he obtained from the scheme, specifically Woodfield Drive, Lititz, Pennsylvania and a 2017 Chevrolet Corvette. He sold these assets prior to sentencing and paid the proceeds of these sales ($90,359) to the Clerk of Court on November 6, 2026.

3. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense

The sentence imposed should reflect the seriousness of the offenses, promote respect for the law, and provide just punishment. The defendant knowingly enriched himself with taxpayer money taken from a government program that was designed to help low-income families. A sentence in the guidelines range will promote respect for law by reinforcing that there are consequences to defrauding the government and will provide just punishment for the defendant.

4. The Need to Afford Adequate Deterrence to Criminal Conduct, and to Protect the Public from Further Crimes of the Defendant

To a white-collar defendant, a sentence of probation, fines, and restitution is the cost of doing business. The government does not believe that those penalties alone are effective deterrence. The government believes that if the defendant knew that he would go to jail for his crimes, he never would have engaged in this fraud scheme. That is effective deterrence and that is why a sentence of incarceration is needed here.

As noted above, the defendant's criminal conduct was not a spur-of-the-moment, irrational act. He knew the claims were false, he submitted the false claims for nine months, he devised an easy way to assign fake tribal addresses to the non-tribal subscribers, and he did all of

this so that he could overbill the ACP. There is every reason to believe that the defendant would have continued to submit fraudulent claims and overbill the ACP, as the fraud scheme ended because of the FCC's investigation. This all leads to the conclusion that the defendant's criminal conduct was the result of a deliberate, rational calculation: that the benefit of the fraud outweighed the risk of getting caught and being punished. A sentence in the guidelines range would deter others from taking this path.

General deterrence is of paramount importance for white-collar offenses. As explained by the Eleventh Circuit:

> Because economic and fraud-based crimes are "more rational, cool, and calculated than sudden crimes of passion or opportunity," these crimes are "prime candidate[s] for general deterrence." Defendants in white collar crimes often calculate the financial gain and risk of loss, and white-collar crimes therefore can be affected and reduced with serious punishment.

*United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (*quoting in part* Stephanos Bibas, *White-Collar Plea Bargaining and Sentencing After Booker*, 47 WM. & MARY L. REV. 721, 724 (2005)).

A sentence within the advisory guidelines range would send a message to other would-be white-collar criminals that imprisonment is a real prospect for those who steal from the government, even those, like the defendant, who are young and do not have any prior criminal record.

5. The Need to Provide the Defendant with Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner

There is no need to adjust the defendant's sentence "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). The defendant will have the opportunity to take

advantage of educational and/or vocational training provided by the Federal Bureau of Prisons ("BOP") while serving his term of incarceration.

6. The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records who Have Been Found Guilty of Similar Conduct

There are no co-defendants in this case.

7. The need to Provide Restitution to Victims of the Offenses

Pursuant to the plea agreement, the defendant has agreed to pay restitution in the amount of $741,726 to the victims of his fraud schemes. On November 6, 2026, the defendant made a payment of $90,359 toward that restitution figure.

**D. Supervised Release**

Pursuant to USSG §§ 5D1.1 and 5D1.2, as amended effective November 1, 2025, the Court is directed to conduct an "individualized assessment" when deciding whether to impose a term of supervised release, and if supervised release is imposed, how long the term should be. The Court is further directed to state in open court its reasons for imposing or not imposing a term of supervised release, and its reasons for the length of a term imposed. Further, Section 5D1.3 sets forth mandatory conditions of a term of supervised release, and "discretionary conditions" that the Court may impose, following the same individualized assessment.

The guideline commentary, consistent with 18 U.S.C. § 3583(c), provides that the "individualized assessment" should rest on consideration of the same sentencing factors under 18 U.S.C. § 3553(a) that are considered with respect to a term of imprisonment, with the exception of Sections 3553(a)(2)(A) (the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense") and 3553(a)(3) ("the kinds of sentences available"), which do not apply with regard to supervised release decisions.

The government requests a term of supervised release of three years. While the defendant does not have a criminal record, the conduct involved thousands of false reimbursement claims. Additionally, based on the PSR, the defendant continues to operate his own business and aspires to grow the company in the future. These are laudable goals, but the defendant carried out this fraud scheme through his small business and, as a result, further supervision after release from custody is warranted to aid his reentry to society and protect the public. A three-year term of supervised release in this case advances the goals of sentencing to deter criminal conduct, § 3553(a)(2)(B), protect the public, § 3553(a)(2)(C), assure that the defendant continues to pursue vocational efforts that promote rehabilitation, § 3553(a)(2)(D), and pays any remaining forfeiture amounts. This assessment also supports imposition of all the mandatory and standard conditions of supervised release listed in USSG § 5D1.3 in addition to the special condition regarding access to financial information (USSG § 5D1.3(b)(3)(C)), given the defendant's restitution and forfeiture obligations.

## III. CONCLUSION

The government's recommendation regarding sentencing appears in the sealed attachment.

Respectfully submitted,

DAVID METCALF
United States Attorney

*/s/ Francis A. Weber*
Francis A. Weber
Assistant United States Attorney

Dated: November 9, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the Government's Sentencing Memorandum has been served by ECF upon the following:

Timothy M. Stengel, Esq. (tstengel@saxtonstump.com)

*/s/ Francis A. Weber*
FRANCIS A. WEBER
Assistant United States Attorney

Dated: November 9, 2026