**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CASE NO. 26-CR-205 |
| | : | |
| KRANDON WENGER | : | |

**KRANDON WENGER'S SENTENCING MEMORANDUM**

On June 2, 2026, Krandon Wenger pleaded guilty to both counts of a two-count Information. In doing so, he waived his right to prosecution by Indictment and fully accepted responsibility for actions. This was his first encounter with the criminal justice system.

He now stands before this Honorable Court and humbly requests a sentence that is sufficient but not greater than necessary to comply with the purposes of sentencing. For the reasons set forth below, Mr. Wenger submits that, when all relevant factors are considered, a sentence below the applicable sentencing guideline range of 15 to 21 months' imprisonment is appropriate in this case. Specifically, Mr. Wenger respectfully requests one day of confinement to be followed by three years of supervised release, with some liberty restraint, such as a period of home confinement.

## I. FACTUAL & PROCEDURAL BACKGROUND

Although the Presentence Investigation Report ("PSR") aptly summarizes the factual and procedural history of the case (*see* PSR ¶¶ 1-21), some additional explication of the pre-charging history may serve useful for the Court. On March 18, 2022, Mr. Wenger, on behalf of K20 Wireless LLC, a company he owned and controlled, applied to be a service provider under the Affordable Connectivity Program (ACP). The ACP was a COVID-era government program that provided

financial support to eligible low-income households to receive broadband services during the pandemic. Under the ACP, a provider, like K20 Wireless, was reimbursed $30 per month per household for which it provided broadband service. If, however, the household was located on Tribal lands, the monthly reimbursement increased to $75. Mr. Wenger, through K20 Wireless, took advantage of this increase and submitted claims for households on Tribal lands that were not, in fact, on Tribal lands.

On April 14, 2023, Mr. Wenger was notified that K20 Wireless was suspended as an ACP provider due to irregularities in the reimbursements he submitted. He submitted claims for reimbursement once more, in May of 2023. A year later, in May 2024, the Federal Communications Commission ("FCC") issued a Notice of Apparent Liability for Forfeiture and Order Initiating Removal Proceedings, setting forth the specific allegations against him.

Mr. Wenger immediately set out to make things right, a path on which he continued, as the administrative enforcement action turned into a criminal prosecution. Specifically, Mr. Wenger retained counsel and sought to enter into consent decree negotiations with the FCC. These negotiations went nowhere, at least in part, because federal law enforcement began to investigate, as Mr. Wenger later learned.

Mr. Wenger first learned of the criminal investigation in December 2025, upon receipt of a target letter, and he immediately retained the undersigned counsel. Not long after, Mr. Wenger entered into a plea agreement, through which he agreed not to contest the charges for which he will now be sentenced, nor the related financial penalties, and he waived nearly all his appellate rights. He then pleaded guilty on June 2, 2026, and he is scheduled to be sentenced on November 17, 2026.

## II. SENTENCING ANALYSIS

As an initial matter, Mr. Wenger agrees with the Probation Office's calculation of the applicable Sentencing Guidelines range, that is, 15 to 21 months' imprisonment. But this range is only a starting point. In arriving at a particular sentence, the Court must consider the specific factors set forth in 18 U.S.C. § 3553(a) and must "impose a sentence sufficient, but not greater than necessary to comply with the purposes" of sentencing. In this case, the 3553(a) factors, which we will address in turn below, strongly suggest that a sentence well-below the applicable range is warranted in this case.

### A. The nature and circumstances of the offense and the history and characteristics of the defendant (18 U.S.C. § 3553(a)(1))

There is no question that this was a serious offense. Mr. Wenger submitted false claims for unwarranted reimbursements from a government program. The courtroom at sentencing may not be packed with dozens of victims from the community, but this was by no means a victimless crime. That said, Mr. Wenger's lack of criminal history, the aberrant nature of his actions, his support system, and his potential to be a productive member of society all act as a counterweight to the admitted seriousness of the offense here.

Mr. Wenger is the youngest of five siblings. He and his brothers and sisters were home schooled and raised in a supportive environment, and he had what he described as "a happy childhood." That did not change as he got older. Mr. Wenger met his wife in 2020, and by every indication, he has been a "caring and loving husband." He has also built lasting relationships with others in the community, some of whom have written letters on his behalf[1] and from whom the Court will likely hear at Mr. Wenger's sentencing hearing.

---

[1] Counsel is in the process of gathering letters in support of Mr. Wenger and will provide them to the Court in advance of the hearing.

That is not to say his life has been without challenges. For example, during the COVID-19 pandemic, Mr. Wenger, like many others, suffered through some mental health challenges. At the time, he was using marijuana, which led to a psychotic episode when the marijuana mixed with another medication. Notably, he has refrained from drug use ever since, and apart from some recent alcohol abuse, he has lived a mostly substance free life.

Mr. Wenger attended some college, but eager to begin his career, Mr. Wenger left college to pursue a business opportunity. In 2020, Mr. Wenger started K20 Wireless and later applied to be a service provider under the ACP. He was only 21 years old at the time, and he made a series of poor choices that led to the charges in this case. At his sentencing hearing, Mr. Wenger will speak to his frame of mind at that time and what drove him to do what he did, but fair to say, he became impatient for financial success. But whatever his reasons, his actions during that time are undeniably inconsistent with the rest of his life.

The aberrant nature of his actions is highlighted by what he did after he learned of the allegations. Although he received notice of irregularities from the FCC in April 2023, he did not receive confirmation of the investigation until approximately a year later. Mr. Wenger, who had never run afoul of the law before, immediately retained FCC counsel to guide him on how to move forward, displaying a maturity far beyond his years – and one that stands in stark contrast to his initial choice to submit false reimbursements to a government program. With the assistance of counsel, Mr. Wenger attempted to resolve the allegations against him, but the enforcement action took a backseat to a criminal investigation. When that became clear, he quickly sought the advice of federal criminal counsel.

It is not surprising that Mr. Wenger sought the support of legal professionals at this time, as Mr. Wenger had enjoyed the support of his family throughout his life, which taught him that he

need not face adversity on his own. That family support has been imperative over the last few months, as Mr. Wenger has come to terms with the very serious consequences of his actions. For example, when the weight of those consequences led Mr. Wenger to self-medicate by consuming alcohol, the support of his family helped him get a handle on his drinking. That support bodes well for his future as a law-abiding and productive member of society, and the Court should consider that when fashioning an appropriate sentence in this case.

**B. The need for the sentence imposed to reflect the goals of sentencing (18 U.S.C. § 3553(a)(2))**

**1. The need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense**

The requested sentence will reflect the seriousness of the offense while taking into account a variety of factors that support a below-guidelines sentence. Importantly, this was Mr. Wenger's first interaction with the criminal justice system, and although his lack of criminal history is, to some extent, contemplated by the applicable guidelines, his actions in the face of the Notice of Apparent Liability and a federal target letter are not.

Mr. Wenger initially attempted to resolve this matter with the FCC, but he was unable to do so, and after the federal criminal investigation became known, he quickly sought to accept responsibility for his actions. Mr. Wenger requested no discovery, apart from a request of counsel to review support for a stipulation as to fraud loss, and he waived his right to prosecution by Indictment. This is a form of acceptance of responsibility that has no defined value in the law, but it is nonetheless highly valuable to both the courts and the prosecution, and the Court should give it the weight it deserves when determining a just sentence.

But more so, Mr. Wenger's choice to plead to an Information is important because of what it says about him. Mr. Wenger's decision to engage counsel early and to accept responsibility

demonstrates that, despite his choice to submit false reimbursements, he understands that what he did was wrong and that he has respect for the law. He has matured, and his past choices are just that – a part of his past and not his future.

**2. The need for the sentence imposed to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant**

This prosecution will unquestionably deter Mr. Wenger from committing future crimes, regardless of what punishment follows. Research has consistently shown that while the *certainty* of being caught and punished has a deterrent effect, "increases in *severity* of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, Purposes and Functions of Sentencing, 34 Crime & Just. 1, 28 (2006) (emphasis added); *see also* Zvi D. Gabbay, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity."); Andrew von Hirsch et al., Criminal Deterrence and Sentence Severity: An Analysis of Recent Research (1999) (report commissioned by the British Home Office that examined the effects of changes to both the certainty and severity of punishment and concluded that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects."). Research regarding white collar offenders in particular (presumably the most rational of potential offenders) has found no difference in the deterrent effect of probation and that of imprisonment. *See* David Weisburd *et al.*, Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes, 33 Criminology 587 (1995). *See also* Gabbay, *supra*, at 448-49 ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."). Interestingly, even Department of Justice research shows that "[i]ncreasing the severity of punishment does little to deter crime,"

because "the certainty of being caught is a vastly more powerful deterrent than the punishment." U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, "Five Things About Deterrence" (June 5, 2016), *available at* https://nij.ojp.gov/topics/articles/five-things-about-deterrence.

Although "certainty" and "severity" of punishment are often discussed in the context of general deterrence, it should not be lost on the Court that this was Mr. Wenger's first and only encounter with the criminal justice system, and by all accounts, he has lived an otherwise law-abiding life. Yet, he has found himself under the prosecutorial weight of the federal government, so from his perspective, the certainty of punishment appears all but guaranteed. The question then, is whether incarcerating this young man for his first offense will have any notable deterrent impact on the broader community. We submit that it will not.

Although this case presents one of the few examples of a prosecution related to ACP reimbursements, it is worth noting that the ACP was a COVID-era program, and crimes connected to similar programs designed to ease financial burdens associated with the pandemic have been prosecuted at staggering rates. Thus, the certainty of punishment for crimes of this type is relatively high, and a sentence less severe than the applicable guideline range will not meaningfully impact the deterrent effect.

That is not to say that a sentence comprised mostly of non-custodial court supervision, like that requested here, is not severe. The Supreme Court has stated: "probation, rather than 'an act of leniency' is a 'substantial restriction of freedom.'" *Gall v. United States*, 552 U.S. 38, 44 (2007) (quoting approvingly district court's characterization of a sentence of probation). *See also United States v. Coughlin*, No. 06-20005, 2008 U.S. Dist. LEXIS 11263, 2008 WL 313099, at *5 (W.D. Ark. Feb. 1, 2008) ("Home detention and probation can be severe punishments, hugely

restrictive of liberty, highly effective in the determent of crime and amply retributive.”). Similarly, the Supreme Court has recognized that the all-too-frequent practice of “quantifying the variance as a certain percentage of the . . . sentence recommended by the Guidelines gives no weight to the substantial restriction of freedom involved in a term of supervised release or probation.” *Gall*, 552 U.S. at 48 (internal quotation marks and citation omitted) (emphasis added). *See also United States v. Tomko*, 562 F.3d 558, 572-75 (3d Cir. 2009) (citing *Gall* while affirming the district’s court’s imposition of probation in the face of guidelines suggesting imprisonment).

In the Supreme Court’s view, even though “custodial sentences are qualitatively more severe than probationary sentences . . . [o]ffenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty.” *Gall*, 552 U.S. at 48. For example:

> Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking.

*Id*. These sorts of conditions “can have a significant impact on both [the probationer] and society. . . . Often these conditions comprehensively regulate significant facets of their day-to-day lives.” *Id*. at 49, n.4 (internal quotation marks and citation omitted) (citing examples including frequent searches by government officials).

If protracted court supervision constitutes a significant punishment, and if research confirms that imprisonment will not necessarily advance general deterrence more than being caught, then the sentence requested here will more than adequately advance deterrence and

promote respect for the law. In fact, under the circumstances of this case, "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall*, 552 U.S. at 54 (internal quotation marks and citations omitted).

**C. The kinds of sentences available (18 U.S.C. § 3553(a)(3))**

No minimum mandatory sentence applies in this case. Therefore, this Court has available to it a wide range of sentencing options under which the Court can creatively fashion a sentence that reflects one minimally sufficient to meet the goals of sentencing as required under 18 U.S.C. § 3553(a). A total offense level of 14 renders Mr. Wenger ineligible – though barely – for a straight probationary sentence under the advisory guidelines, but Mr. Wenger urges the Court to grant a downward variance and sentence him to a minimal term of incarceration to be followed by three years of supervised release, with whatever liberty restraints the Court deems appropriate.

**D. The Sentencing Guidelines and any pertinent policy statements issued by the Sentencing Commission (18 U.S.C. §§ 3553(a)(4) and (5))**

Under 18 U.S.C. §§ 3553(a)(4) and (5), the Court must consider the federal sentencing guidelines and pertinent policy statements, which recognize that courts must vary from the guidelines when application of 18 U.S.C. § 3553(a) requires. *See* U.S.S.G. § 1B1.1(c). *See also* U.S.S.G. Part A – *Introduction and Authority,* subsection 2 – *Continuing Evolution and Role of the Guidelines*.

**E. The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct (18 U.S.C. § 3553(a)(6))**

The Court is also required to avoid unwarranted sentencing disparities. The Court should therefore consider the relatively high rates at which federal courts grant downward variances in white collar cases. For example, based on research available on the United States Sentencing Commission website, in government benefit fraud cases, 43% of sentences reflected downward variances; in healthcare fraud cases, 41% of sentences reflected downward variances; and in theft, property destruction and fraud offenses, 40% of sentences reflected downward variances. *See* United States Sentencing Commission, Quick Facts, *available at* https://www.ussc.gov/research/quick-facts (Nov. 10, 2026). As set forth above, there are reasons for the Court to vary downward here, and doing so will result in a sentence that is consistent with those imposed in other similar cases.

**F. The need to provide restitution to any victims of the offense (18 U.S.C. § 3553(a)(7))**

Mr. Wenger has agreed to and has already taken steps to pay restitution to the victim in this case. He will continue to do so to the best of his ability, but notably, his ability to repay the victims will be severely curtailed by a lengthy custodial sentence. Thus, the need to provide restitution actually cuts in favor of a non-custodial sentence, as Mr. Wenger can make real progress toward repaying the government.

## III. CONCLUSION

For all the above reasons, the Court should reject the government's invitation to impose a guideline sentence and instead vary from the advisory imprisonment range and impose one day imprisonment with three years of supervised release, to which the Court can add some liberty restraint, such as a period of home confinement, if the Court deems it appropriate.

Respectfully submitted,

SAXTON & STUMP

By: *s/ Timothy M. Stengel*

TIMOTHY M. STENGEL, ESQ.
PA Bar I.D. 314573
280 Granite Run Drive, Suite 300
Lancaster, PA 17601
tstengel@saxtonstump.com
(717) 556-1010

Dated: November 10, 2026

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that a true and correct copy of the foregoing was served, this 10th day of November, 2026, via the Court's electronic filing system upon all parties of record.

*/s/ Timothy M. Stengel*
TIMOTHY M. STENGEL